[Cite as *State v. Williams*, 2022-Ohio-2674.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                              :

    Plaintiff-Appellee,                :

                                No. 110991

    v.                                 :

DARIUS ANTONIO WILLIAMS,                    :

    Defendant-Appellant.               :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** August 4, 2022

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-20-652146-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Alaina Hagans, Assistant Prosecuting
Attorney, *for appellee.*

Erin R. Flanagan, *for appellant.*

LISA B. FORBES, P.J.:

{¶ 1} Darius Antonio Williams ("Williams") appeals his convictions for two
counts of felonious assault with firearm specifications associated with the shooting
of Robert Cloud ("Cloud"). Specifically, Williams raises one assignment of error,

arguing that "the finding that the state negated [his] claim of self-defense by disproving the elements of the affirmative defense beyond a reasonable doubt" is against the manifest weight of the evidence. After reviewing the facts of the case and pertinent law, we affirm the trial court's decision.

## I. Facts and Procedural History

{¶ 2} On the night of August 1, 2020, Williams went to Tyanekia Fields's ("Tyanekia") house on Bliss Avenue in Cleveland. Tyanekia is the mother of Williams's ex-girlfriend, Takia Fields ("Takia"). Cloud is Tyanekia's boyfriend. Tyanekia, Takia, and Cloud were all at Tyanekia's house when Williams arrived. At one point, Cloud went to the front door with a BB gun. Williams shot his gun into Tyanekia's house, hitting Cloud twice in the side and once in the leg.

## II. Trial Testimony

### A. Tyanekia Fields

{¶ 3} Tyanekia testified that her daughter Takia "had a relationship with" Williams. According to Tyanekia, she, Takia, Cloud, and Takia's two children were at Tyanekia's house in Cleveland on the night of August 1, 2020. Sometime between midnight and 1:00 a.m. on August 2, 2020, Williams arrived at the house uninvited. Takia and Williams "got into a little argument" on the front porch. Tyanekia went outside to the front porch and asked Williams "could he please leave the premises because he just looked like he was, you know, ready to do something actually." Tyanekia walked with Williams to his truck, and she saw a gun on the driver's seat. According to Tyanekia, she told Williams "we didn't want no problems or nothing."

**{¶ 4}** Tyanekia went back inside and "heard at least about two or three" gunshots. Cloud was sitting in the dining room at the time and went to the front door. Cloud then told Williams to leave and that they did not want "drama." According to Tyanekia, Cloud had a BB gun "right on the side of his leg * * * pointing towards the ground, the floor." According to Tyanekia, Cloud "never pointed the BB gun at all. He just had it on his side of him. He never pointed it. He never came out the door or anything."

**{¶ 5}** Tyanekia testified about what happened next:

> I told [Cloud] just — you know, sit down and hopefully [Williams will] leave. But then when I went out to [Williams] to tell him, I didn't get a chance to tell him that it was a BB gun because everything was happening so fast. I actually just told [Williams] that I have the BB gun, which I didn't say it was actually a BB gun. I just said I have it. And [Cloud], we don't — I took it from him. There's nothing going on. We don't want anything. We don't want drama or anything.

**{¶ 6}** Tyanekia took the gun from Cloud and put it "up in the kitchen." Cloud went back into the dining room. Tyanekia began to call 911, but before she could complete the call, Williams came inside the house through the front door and shot Cloud three times. Tyanekia was standing in the first-floor bedroom doorway when this happened. She saw Williams enter the house. "But I wasn't right there when he shot. But I heard the shots as he came in and shot [Cloud] three times." Tyanekia testified that Williams "ran out of the house" after he fired his gun.

**{¶ 7}** According to Tyanekia, she did not see "a gun anywhere near" Cloud when he was shot. Tyanekia testified that she did not hear Cloud "make any threats."

Tyanekia further testified that the BB gun was in the kitchen when Williams shot Cloud.

**{¶ 8}** On cross-examination, defense counsel played a video from the body camera of the first police officer to arrive at Tyanekia's house after the shooting. In this video, Tyanekia told the officer, "My boyfriend went to the door and kind of threatened [Williams] with a gun." Tyanekia also said to the officer, "My dude came to the door protecting the home." She later told the officer, "[Cloud] didn't threaten him. He just went to the door to tell him leave it alone."

**{¶ 9}** Tyanekia further told the officer that Williams "felt threatened by" Cloud, because she heard Williams say this when he was outside. Tyanekia testified as follows about the statements she made to the police officer immediately after the shooting: "I was really shook up and everything so when I said that * * * he really, really wasn't a threat because I was all shook up from everything that was going on."

**{¶ 10}** Tyanekia testified that none of the police officers asked to see the BB gun, and she did not offer to show them the BB gun.

**B. Takia Fields**

**{¶ 11}** Takia testified that she dated Williams from May 2019 to "the day before the incident happened." On August 1, 2020, Takia and Williams engaged in text message conversations in which he said things such as "we ain't breaking up," and she told him that she "don't want to be with him anymore." Takia texted Williams that she was with her mother and to "[l]eave me alone please." Williams texted back, "I'm on my way over there."

{¶ 12} Takia testified that Williams arrived at her mother's house that night at 10:00 or 11:00 p.m., and she met him outside. She told him to leave, but he was acting "aggressive" in his "body movements" and "tone." She was unable to calm Williams down, and "he started shooting in the air." Asked where the gun came from, Takia testified, "[i]t was underneath the seat in the car," although she did not see Williams get the gun.

{¶ 13} Takia went inside her mother's house and heard "the gunshots from [Williams's] gun and I saw the lights from his gun. And my step dad was on the floor from being shot from [Williams's] gun that he shot him with." Takia testified that she did not know "the exact time," but, at some point earlier that night, Cloud had a BB gun "on the side of him. * * * Just in his hand like or something. In his hand. But he definitely didn't like — he wasn't doing anything or he wasn't like — he did not point the BB gun at [Williams]." When Cloud had the BB gun, he was "in the area by * * * the front door." According to Takia, Cloud did not have the BB gun with him when he was shot.

{¶ 14} Takia did not tell the police that Cloud had a BB gun that night. However, she told the police officer at her mother's house that Williams felt threatened. Takia testified that she told the officer that Williams felt threatened, but "that don't mean it's accurate" because it was "an assumption."

**C. Robert Cloud**

{¶ 15} Cloud testified that between 10:30 p.m. and 11:00 p.m. on August 1, 2020, he was home with his girlfriend Tyanekia and her daughter Takia when

Williams arrived at the house. Takia went outside to talk to Williams. Cloud stayed in the house. Cloud testified that he heard two gunshots while Williams was outside at his truck.

{¶ 16} At one point, Cloud came to the door and asked Williams to leave. Cloud had a Crossman BB gun with him, "on the side of me, on the right-hand side of me." According to Cloud, it was "in my hand" pointed "[d]own to the floor." Williams told Cloud to come outside. Cloud walked back into the dining room. Cloud testified as follows about what happened next:

> [A]ll of a sudden [Williams] came back to the door, like, come on outside. Come on. You come outside.
>
> I said [Williams], just leave, man. Just leave, man. We don't want no problem, man. Just leave.
>
> He said, no, no. Come on outside.
>
> Next thing you know, boom, boom, boom, shot me three times.

{¶ 17} Asked if he had the BB gun with him at the time Williams shot him, Cloud said, "No. I handed it to [Tyanekia]." Asked if he ever pointed the BB gun at Williams, Cloud answered, "No." Asked if he ever threatened Williams, Cloud testified, "Well, only time I told [Williams], I said, just leave the home, man. I ain't never threaten him, nothing. I said, just leave the home. We don't want you here."

{¶ 18} Cloud testified that immediately after he handed Tyanekia the BB gun, Williams "came in firing." According to Cloud, Tyanekia was "supposed to have told" Williams "[the gun] wasn't real."

{¶ 19} Cloud testified that he was convicted of a felony in 2015, spent four years in prison, is on postrelease control, and is not allowed to possess a firearm. Cloud testified that he had a BB gun that night, and that when he was interviewed by a detective at the hospital, he told the detective that he had a BB gun that night.

{¶ 20} The recording of this interview at the hospital does not show Cloud telling the detective that he had a BB gun, or any type of gun, that night. After watching the taped interview, where there was no mention of Cloud having a gun that night, Cloud testified, "Anybody can cut an interview. Come on."

{¶ 21} Cloud testified that he has damaged nerves from being shot, he suffers from "pain all night," he walks with a cane, and has a rod in his right leg.

### D. Former Detective Todd Clemens

{¶ 22} Former Cleveland Police Detective Todd Clemens testified that he recovered three 9 mm Luger shell casings from the street and three 9 mm Luger shell casings from the living room floor of the "crime scene investigation * * * on Bliss Avenue in Cleveland" on August 2, 2020.

### E. James Kooser's Testimony

{¶ 23} James Kooser ("Kooser"), who testified as an expert witness, stated that he is a forensic firearms and tool marks examiner with the Cuyahoga County Regional Forensic Science Laboratory. Kooser testified that he compared the six fired shell casings found inside and outside of Tyanekia's house to "test fired casings" from a firearm recovered from Williams's truck on August 2, 2020. Kooser

testified that all six recovered shell casings were fired from the gun found in Williams's truck.

**F. Officer Jeffrey Kozma**

{¶ 24} Cleveland Police Officer Jeffrey Kozma ("Off. Kozma") testified that he responded to a call reporting a "male shot" in the early morning hours of August 2, 2020, at Bliss Avenue in Cleveland. Off. Kozma gathered information about the suspect and his vehicle. According to Off. Kozma, "Tyanekia * * * stated a male came over, there was some type of an argument at which point it escalated and a male went and pulled a gun and started shooting." Off. Kozma also learned that the "individual from the home had a gun."

**G. Detective Erin O'Donnell**

{¶ 25} Cleveland Police Detective Erin O'Donnell ("Det. O'Donnell") testified that she conducted the follow-up investigation regarding a shooting on Bliss Avenue in August 2020. Det. O'Donnell testified that a firearm and casings were recovered from the scene. Det. O'Donnell interviewed Takia, at the house on Bliss Avenue, and Cloud, while he was at the hospital. Her practice is to record interviews with a wearable camera system. According to Det. O'Donnell, who watched the video of her interview at the hospital with Cloud, he did not mention a BB gun during this interview. However, as she was leaving his hospital room and after her video camera was turned off, Cloud told her that he was on parole, and he had a BB gun.

{¶ 26} On cross-examination, Det. O'Donnell testified that she did not further investigate Cloud's off-camera claim that he had a BB gun, and she did not know if Cloud, in fact, possessed a BB gun.

{¶ 27} As part of her investigation, Det. O'Donnell reviewed the body camera footage from the officers who responded to the crime scene and "heard that * * * Cloud possibly had a gun." Asked if the first she heard about a BB gun was at the hospital, Det. O'Donnell replied, "I don't recall."

{¶ 28} Det. O'Donnell also reviewed body camera footage from "the apprehension of Darius Williams." From this video, Det. O'Donnell identified Williams's truck and the firearm recovered from the truck.

{¶ 29} Det. O'Donnell testified about the shell casings found outside and inside the crime scene and concluded that "[a]ccording to all of the evidence that we had, those shell casings came from * * * Williams'[s] gun."

## H. Darius Antonio Williams

{¶ 30} Williams testified that he had no prior criminal record, he drove a taxi in the Cleveland area for a living, and he regularly "open" carries a gun. Williams was in a relationship with Takia, but they broke up just before the incident at issue in this case. They exchanged text messages on August 1, 2020, and he went to Tyanekia's house "about 11:00 at night" so he and Takia could talk. Williams did this despite Takia texting him "don't come over." Williams was "upset with the thought" that Takia might be with another man. When Williams first arrived at the house, he "was there for not even two minutes, about a minute, two minutes, and

pulled right off" in his truck. According to Williams, "[t]he conversation was not going good."

{¶ 31} Williams went back to the house a couple minutes later and sent Takia a text stating "are you ready to talk like adults?" Takia came out of the house, and she and Williams "talked for about 40 minutes or more." At one point, Tyanekia came outside to Williams's truck. His gun was on the armrest of his truck at the time.

{¶ 32} Williams left to get gas and came back to the house "10, 15 minutes" later. At this point, Williams's gun was on his hip in the holster. Williams walked up to the door of the house and knocked. Cloud opened the door and "[a]s he opened the door, he's holding a gun to my face asking me, you know, what's the problem? What's going on?" Williams was not able to see what kind of gun Cloud was holding.

{¶ 33} Williams put his hands up and told Cloud, "I'm scared." Williams "started to turn around before, you know, I discharged my firearm." Asked why he discharged his firearm, Williams answered, "I was scared. I felt like I was going to get shot. If he would have shot me he would have shot me in my neck or mouth." Asked if the gun was at Cloud's side, Williams answered, "No," not at any time.

{¶ 34} Williams shot Cloud three times until Cloud's gun fell out of Cloud's hand. According to Williams, he stopped shooting when the threat stopped. "Once [Cloud] dropped the gun, I stopped firing." Williams then left in his truck and called 911 to report that he shot someone. The dispatcher told Williams to put his weapon

in the bed of his truck. Williams did this and waited until the police came and detained him.

{¶ 35} Williams testified as follows about the shell casings that were found in the street outside of the house: "So after I discharged my firearm I turn and left, ran out of the house, my gun was jammed up. It was jammed like — it wasn't fully back, you know what I mean? Didn't look right. So I fired more rounds into the field across the street."

{¶ 36} Williams testified that he believed Cloud had a "real gun" and Williams felt threatened by this. Asked how Takia knew Williams "felt threatened," Williams testified as follows: "She could tell. You know, anybody who had a gun in their face just coming to the door you are going to be scared." According to Williams, he believed Cloud was going to shoot him and he fired his gun to defend himself.

{¶ 37} Williams testified on cross-examination that when he turned around with Cloud's gun "on the back of my head" and began firing, his "arm is inside of the house * * *. I'm basically getting inside the house."

{¶ 38} According to Williams, there was no mention of a BB gun on the night of the shooting, and "to this day," he does not know if Cloud's gun was a BB gun.

## III. Law and Analysis

### A. Standard of Review — Manifest Weight of the Evidence

{¶ 39} A manifest weight of the evidence challenge "addresses the evidence's effect of inducing belief. * * * In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's?" *State v. Wilson*, 113 Ohio St.3d

382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25.  "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as the 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony."  *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).  Reversing a conviction under a manifest weight theory, "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."  *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

## B. Felonious Assault

{¶ 40} Felonious assault is defined in R.C. 2903.11 as follows:

(A) No person shall knowingly * * *

(1) Cause serious physical harm to another * * *; [or]

(2) Cause or attempt to cause physical harm to another * * * by means of a deadly weapon * * *.

## C. Self-Defense

{¶ 41}  Pursuant to R.C. 2901.05,[1] self-defense is defined as follows:

(B) (1) A person is allowed to act in self-defense, defense of another, or defense of that person's residence.  If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense, defense of another, or defense of that person's residence, as the case may be.

---

[1] We note that both the state and Williams agree that the version of the statute that applies to this case had an effective date of March 28, 2019.

{¶ 42} In other words, when a defendant properly raises self-defense, the burden shifts to the state, which, to sustain a conviction, must prove beyond a reasonable doubt that the defendant: (1) was at "fault in creating the situation giving rise to the affray"; (2) "did not have a bona fide belief that he or she was in imminent danger of death or great bodily harm and that his or her only means of escape from such danger was in the use of force" or; (3) "must not have violated any duty to retreat or avoid danger." *State v. Jackson*, 8th Dist. Cuyahoga No. 108493, 2020-Ohio-1606, ¶ 17; *State v. Walker,* 8th Dist. Cuyahoga No. 109328, 2021-Ohio-2037, ¶ 13 ("in light of the cumulative nature of the self-defense elements, the state need only disprove one of the elements of self-defense beyond a reasonable doubt at trial to sustain its burden * * *.").

{¶ 43} In the case at hand, the court instructed the jury regarding self-defense as follows:

> The state's proof. To prove the defendant did not use deadly force in self-defense the state must prove beyond a reasonable doubt at least one of the following: Either the defendant was at fault in creating the situation giving rise to the shooting of Robert Cloud, or the defendant did not have a reasonable grounds to believe that he was in imminent danger of death or great bodily harm, or the defendant did not have an honest belief, even if mistaken, that he was in imminent danger of death or great bodily harm, or the defendant violated a duty to retreat to avoid injury, or the defendant did not use reasonable force.

## IV. Analysis

{¶ 44} First, we note that it is undisputed that Williams shot Cloud, thus satisfying the elements of felonious assault.

{¶ 45} Upon review, we find that Williams met his initial burden of production, in that evidence presented during trial raised the question of self-defense. Specifically, Williams testified that Cloud held a gun to his face, he felt threatened, and he acted in self-defense. Tyanekia, Takia, and Cloud testified that Cloud went to the front door with a BB gun at his side and pointed downward to talk to Williams. However, Tyanekia told the police officers on the scene that Cloud "kind of threatened [Williams] with a gun." *See State v. Stephens*, 2016-Ohio-384, 59 N.E.3d 612, ¶ 19 (8th Dist.) ("when there is conflicting evidence on the issue of self-defense, the [self-defense] instruction must be given to the jury."); *State v. Sullivan*, 11th Dist. Lake Nos. 2019-L-143 and 2019-L-144, 2020-Ohio-1439, ¶ 45 ("When a defendant's testimony, if believed, would have raised the question of self-defense in the mind of a reasonable juror, the defendant's burden of production has been met.").

{¶ 46} Under R.C. 2905.01(B)(1), the burden then shifted to the state to prove, beyond a reasonable doubt, that Williams did not act in self-defense by showing at least one of three factors.

{¶ 47} The first factor is whether Williams was at fault in creating the situation giving rise to the shooting. In assessing whether the defendant was at fault in a self-defense scenario, courts ask "in essence, whether the defendant was the initial aggressor." *State v. Gardner*, 8th Dist. Cuyahoga No. 110606, 2022-Ohio-381, ¶ 25.

**{¶ 48}** Evidence in the record in the case at hand shows that Williams went to Tyanekia's house, uninvited, to talk with Takia after he and Takia ended their relationship. According to Takia, Williams was "aggressive," and she could not calm him down. Tyanekia testified that Takia and Williams were arguing. Tyanekia asked Williams to leave, because he "looked like he was * * * ready to do something * * *." Williams got his gun from his truck. According to Tyanekia, Takia, and Cloud, Williams fired this gun outside of the house. Tyanekia and Takia testified that Williams came to the front door and shot Cloud, although neither witness saw the actual shooting. According to Cloud, Williams came to the door, told Cloud to come outside, and shot Cloud three times. Tyanekia, Takia, and Cloud testified that, although Cloud had a BB gun at some point that night, Cloud did not have a gun when Williams shot him.

**{¶ 49}** Upon review, we conclude that the manifest weight of the evidence in the record shows that Williams was at fault in creating the situation. Williams testified that he left Tyanekia's house and returned to Tyanekia's house twice that night. At some point before Cloud appeared at the front door with a BB gun, Williams escalated the situation by retrieving his gun from his truck. Furthermore, if believed, testimony was offered that Williams fired shots outside, approached the front door, and fired again into the house. *See State v. Campbell*, 10th Dist. Franklin No. 07AP-1001, 2008-Ohio-4831, ¶ 27 ("The weight of the evidence indicates that appellant was the aggressor and escalated the confrontation by retrieving his shotgun and being the first to shoot.").

**{¶ 50}** Accordingly, the jury could have concluded beyond a reasonable doubt that Williams was the initial aggressor. This is not the exceptional case in which the evidence weighs heavily against finding that the state disproved Williams's theory of self-defense, and his sole assignment of error is overruled.

**{¶ 51}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

LISA B. FORBES, PRESIDING JUDGE

EILEEN T. GALLGHER, J., and
CORNELIUS J. O'SULLIVAN, JR., J., CONCUR